COALITION FOR THE ENVIRON-
MENT et al., Appellants,

v.

John A. VOLPE et al., Appellees.

COALITION FOR THE ENVIRON-
MENT et al., Appellants,

v.

LINCLAY DEVELOPMENT CORPOR-
ATION et al., Appellees.

Nos. 72–1769, 72–1770.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1973.

Decided July 31, 1974.

As Modified on Denial of Rehearing
Sept. 6, 1974.

Lewis C. Green, St. Louis, Mo., for appellants.

Neil Proto, Atty., Dept. of Justice, Washington, D. C., for Government.

F. William McCalpin, St. Louis, Mo., for Linclay.

John H. Gladden, Jefferson City, Mo., for Commission.

Before LAY and BRIGHT, Circuit Judges, and EISELE, District Judge.*

EISELE, District Judge.

This case [1] is before the Court on appeal from summary judgment entered on behalf of defendants Linclay Development Corporation and Earth City Corporation and from orders of dismissal entered on behalf of all of the other defendants in the court below. The trial court's memorandum opinion is reported at 347 F.Supp. 634 (E.D.Mo.1972). Chief Judge Meredith ruled the plaintiffs lacked standing to bring the suit. He found, applying the "injury in fact" test as utilized in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), "that none of the plaintiffs has standing to prosecute this action as plaintiffs cannot allege facts showing they have suffered or will suffer injury, economic or otherwise." 347 F.Supp. at 638. The trial judge in another portion of the opinion characterized the alleged injuries of plaintiffs as follows:

The only injury to plaintiff [sic] is the apparent fact that the actions of defendants are personally displeasing or distasteful to them due to the parties' differing philosophies of land-use planning. The plaintiffs want open space, while the corporate defendants want a planned urban community.

Judicial review does not extend under the [Administrative Procedure Act] to those who seek to do no more than vindicate their own value preferences through the judicial process. [Citations omitted.]

*Id.* We disagree with this characterization of plaintiffs' allegations of injury and believe the court erred in granting summary judgment and in granting the motions to dismiss on the basis of plaintiffs' lack of standing. Accordingly, the case will be remanded for further proceedings.

*Parties—Plaintiff*

Coalition for the Environment (hereinafter Coalition) is a nonprofit corporation comprised of approximately fifty affiliated member organizations and 800 individual members. Although the organization maintains no membership records, it estimates it represents the environmental interests of some 250,000 people residing in the St. Louis region. Citizens for a Healthful Environment (hereinafter Citizens) is also a nonprofit corporation. It is concerned with protecting and preserving a natural and healthful environment in and around the City of Bridgeton, in St. Louis County, Missouri. St. Charles Enthusiasts for a Natural Environment (hereinafter SCENE) is a nonprofit corporation that seeks to achieve sound environmental objectives with respect to air, water and soil for the general welfare and benefit of the citizens of St. Charles County, Missouri. Individual plaintiffs are Charles A. Englert, Anne Englert and John Nichols. Mr. and Mrs. Englert are affiliated with Citizens and reside in Bridgeton near the development chal-

---

* G. THOMAS EISELE, District Judge, Eastern District of Arkansas, sitting by designation.

1. Originally there were two separate suits, one against the Corps and private defendants concerning the construction of a levee and a second against Missouri and federal highway defendants concerning the construction of an interchange. The trial court entered an order consolidating the two cases, and later, plaintiffs filed an amended complaint in the "levee" suit that consolidated the allegations and claims for relief originally stated in the two separate complaints. When the trial judge granted defendants' motions for summary judgment, a separate order was filed in each case. Because of the amended complaint in No. 72–1770, however, we believe the issues tendered are most simply treated as arising from a single proceeding.

lenged in this suit. Mr. Nichols is a resident of the City of St. Charles and the president of SCENE.

*Parties—Defendant*

Linclay Development Corporation (hereinafter Linclay) and its wholly owned subsidiary, Earth City Corporation, are Missouri corporations that are carrying on the land development project at issue. Robert F. Froehlke, Secretary of the Army; General Frederick B. Clarke, Chief of Engineers, Corps of Engineers; the Corps of Engineers; John A. Volpe, Secretary of Transportation; F. C. Turner, Federal Highway Administrator; and the Department of Transportation (hereinafter DOT) are' also named as defendants. The complaint also reads against the Missouri Highway Commission and individual Commission members.

*The Project*

The project challenged in this lawsuit is termed by its developers "Earth City," although it is not an incorporated municipality. It has been planned as a "balanced" residential, commercial and industrial community. Projected employment in the area is 29,000 people. Approximately 12,000 persons will reside in the development. Total daytime population is expected to exceed 40,000. The project is being constructed on a tract of land owned by, or under option to, the private defendants, comprised of approximately 1,700 acres, the major portion of which is located in an unincorporated area of St. Louis County. The land is in the Missouri River flood plain and is bounded on the west by the Missouri River and the Missouri Bottom Road (with the City of St. Charles lying just beyond, and west of, the river); on the south by Interstate Highway 70; on the north by the tracks of the Norfork & Western Railway; and on the east by an irregular property line. To the north and east lies the City of Bridgeton with the northern portion of the tract (be-

tween St. Charles Rock Road and the Norfork & Western tracks) being located within the City of Bridgeton. St. Charles Rock Road transects the tract in a generally west-east direction slightly north of center. That road, also described as Missouri Route 115, serves as a partial city limit for Bridgeton. Missouri Bottom Road branches off St. Charles Rock Road on the south side, leads down close to the river, then under the St. Charles Rock Road bridge, and then northwardly on the river side of the Earth City levee approximately parallel to the river channel through the portion of the tract within the Bridgeton city limits (between St. Charles Rock Road and the Norfork & Western tracks).

Prior to acquisition by the development group, the land was utilized for the most part for agricultural purposes. Some commercial establishments were located along St. Charles Rock Road. The farm lands were protected by an agricultural levee constructed along the western perimeter of the site.

Two aspects of the Earth City development are challenged by plaintiffs. One is an urban levee and flood protection system superseding the agricultural levee, along the western perimeter of the tract; the second is a proposed interchange with Highway I–70. The levee will run from the I–70 embankment across the St. Charles Rock Road embankment and into the embankment of the Norfork & Western Railway. The interchange will tie in to I–70 in the southwest corner of the development. The entire project, including the levee and the interchange, is being financed by appellees Linclay and Earth City Corporation by or through private sources. No federal or state funds are involved.

After acquisition of the tract, the developers petitioned the St. Louis County Council and the City of Bridgeton to change the zoning of the land in question [2] to permit the uses contemplat-

2. St. Louis zoning had previously designated the area as "Flood Plain, Non-Urban,"

which permitted uses compatible with normal river activity such as periodic flooding.

ed in the development plan. Both governing bodies acted favorably initially, but Citizens has filed a referendum petition that has suspended temporarily the rezoning of that portion of the tract within the Bridgeton city limits. The St. Louis County zoning authority on the other hand has permitted the project to go forward, but under certain conditions imposed by ordinance.[3]

*The Causes of Action*

Plaintiffs' goal in this lawsuit is the subjection of the entire Earth City project to the strictures of the National Environmental Policy Act of 1969 (hereinafter NEPA), 42 U.S.C. §§ 4321, 4331–4335, 4341–4347 (1970). To achieve that goal they seek to implicate the federal defendants, the Corps of Engineers and the Department of Transportation, in the decision-making processes that have permitted the project to go forward. The urban levee and the I–70 interchange are, according to the plaintiffs' allegations, essential to the overall project. In simple terms, plaintiffs contend formal federal authorization was a necessary precondition to both improvements and that such federal action, if taken, would have automatically invoked the requirement of NEPA that an environmental impact statement be prepared.

Appellants contend the procedural requirements of NEPA cannot be avoided by the federal defendants' disclaimer of interest or their failure to act in circumstances where (as here, plaintiffs insist) the federal agencies had a duty to act.[4] Appellants further submit that the scope as well as the specifics of defendants' regulatory obligations are governed not only by the particular statutes and regulations setting out the jurisdiction, functions, duties and responsibilities of the particular agencies, but also, in a more general sense, by the NEPA itself, since that Act sets forth a congressional mandate that federal agencies review their statutory authority, policies and procedures (whether self-imposed by regulation or as defined by statute) and declares a congressional intent that such agencies, to the extent permitted by law, conform their practices and exercise their authority so as to maximize the effect of NEPA's requirements.[5] Thus

Among the uses permitted under that designation are agriculture, park, wildlife refuge, and golf course.

3. The ordinance, "St. Louis County Ordinance No. 5866, amending the St. Louis County Zoning Ordinance," became effective on May 24, 1971. It specifies levee design, building and pollution control standards, and imposes a continuing requirement that proposed streets and driveways, landscaping and other design features be subject to the jurisdiction of the Planning Commission for approval consistent with the "final development concept plan."

4. *See generally*, 1 V. Yannacone, Jr. and B. Cohen, Environmental Rights and Remedies §§ 7:1–7:5 (1972).

5. The pertinent statutes provide:
 (a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing

further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

 (b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may

 (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

under appellants' theory of the governing law, NEPA has a twofold relevance to the litigation: (1) NEPA obliges the federal defendants to execute their specific statutory duties in such a manner as will aggressively assert and defend environmental interests, and (2) it imposes specific obligations to prepare an environmental impact statement to accompany every recommendation of "major Federal actions significantly affecting the quality of the human environment, * * *." 42 U.S.C. § 4332(C).

Whether there is a federal nexus to the project, or in statutory terms, whether the project is in part, or should be, the product of "major federal action" is vigorously contested by the parties. Plaintiffs contend statutes require the Corps and DOT formally to approve, respectively, the levee construction and the interchange.[6] In the alternative, they contend both agencies have at least informally approved the improvements and that the Corps has proceeded to assist the private defendants in the levee construction, all in circumvention of NEPA. And as a third alternative, appellants argue the Corps' determination not to take jurisdiction was a major federal action within the meaning of NEPA and required compliance with NEPA's impact disclosure provisions in connection therewith. In view of our limited holding, see infra, whether the project involves "major federal action" in any of the ways suggested is a question that will have to be resolved in the first instance by the trial court.

The Corps' alleged regulatory obligations stem from its authority over navigation and flood control. The Rivers and Harbors Act of 1899, 33 U.S.C. §§ 401, 403 (1970), prohibits "construction" or "filling" in navigable rivers without prior Corps approval and then only in accordance with Corps plans and specifications. Plaintiffs allege further that private defendants plan to construct an "outfall" for industrial and other wastes emptying into the Missouri River. They assert defendants have failed to procure a permit as required by the Refuse Act of 1899, 33 U.S.C. § 407, and Executive Order No. 11574, Dec. 23, 1970, 35 Fed.Reg. 19627.

Plaintiffs argue also that by the Flood Control Acts of 1936,[7] 1938[8] and 1944[9] the Corps is required to supervise and prosecute the development of the

---

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.
42 U.S.C. § 4331.

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.
42 U.S.C. § 4333.

6. For a recent and thorough discussion of remedies for agency inaction, see Comment, Judicial Control of Administrative Inaction: Environmental Defense Fund, Inc. v. Ruckelshaus, 57 Va.L.Rev. 676 (1971).

7. Pub.L.No.738, 49 Stat. 1570, now codified at 33 U.S.C. §§ 701a, 701b, 701h (1970).

8. Pub.L.No.761, 52 Stat. 1215, now codified at 33 U.S.C. §§ 701b, 701j (1970).

9. Pub.L.No.534, 58 Stat. 887, now codified at 33 U.S.C. §§ 701-1, 701a-1 (1970).

Pick-Sloan levee system, of which the Missouri River basin is a part. They contend the private levee is a part of that system and is therefore subject to federal jurisdiction. More specifically, under 33 U.S.C. §§ 565 and 701 (1970), according to plaintiffs, the Corps is directed to supervise private improvements for flood control purposes to insure that they conform to the Pick-Sloan master plan. Such supervision, they contend, must be in accordance with NEPA.

Plaintiffs also contend the Corps defendants have failed to comply with 16 U.S.C. § 662 (1970), which requires consultation with the United States Fish and Wildlife Service before implementation of modifications in waterways by a federal agency or by private authority under a federal permit.

Plaintiffs' allegations against Department of Transportation officials are of a similar nature. Allegedly, the Missouri defendants, the Missouri Highway Commission and members thereof, entered into an agreement with Linclay and Earth City Corporation on or about August 11 and 13, 1971. The agreement in part related to the construction of the Earth City interchange on I-70 and includes provisions concerning the construction of the urban levee and its tie-in to the roadway fill of I-70 and St. Charles Rock Road. The agreement requires approval of the construction by the Federal Highway Commission. Such approval is also required, argue plaintiffs, by 23 U.S.C. §§ 111 and 116 (1970). And according to plaintiffs' theory of the case, the Department of Transportation could not have legally approved the project without first complying with NEPA and with 23 U.S.C. § 128 (1970), which requires a state highway department submitting a plan for certain federal-aid highway projects to the Secretary of Transportation to hold public hearings and to consider the social and environmental (among other) consequences of the proposed project.

In addition to the allegations of law violation marshaled against the federal defendants, plaintiffs assert the private defendants are in violation of various St. Louis County ordinances.

Jurisdiction in the case is predicated on the Administrative Procedure Act, 5 U.S.C. § 702 (1970), 28 U.S.C. § 1331(a) (federal question), 28 U.S.C. § 1337 (regulation of commerce), and 28 U.S.C. § 1361 (mandamus), and the doctrines of pendent and ancillary jurisdiction.

The relief requested by plaintiffs is the declaration that the federal defendants have a duty to assume jurisdiction of the various proposed improvements to insure adequate flood protection and compliance with NEPA and other applicable federal requirements. They also request that the private defendants be enjoined from continuation of their work on the project until required permits and authorizations are obtained and that federal defendants be enjoined from continuing their alleged informal advice and assistance to Linclay and Earth City Corporation without compliance with applicable law. Plaintiffs pray further that the private defendants be ordered to restore the tract to its condition as of May 20, 1971, and that plaintiffs be awarded their costs as well as all other appropriate relief. No temporary, preliminary or interim relief was sought in the District Court.

The defendants responded to the amended complaint with motions for summary judgment and to dismiss. The State defendants by motion to dismiss challenged plaintiffs' standing; asserted sovereign immunity; and argued the complaint failed to state a claim upon which relief can be granted. The private defendants filed a motion for summary judgment and a motion to dismiss. Summary judgment was requested for the reason that plaintiffs allegedly lack standing; dismissal was requested on the grounds that the complaint failed to state a claim upon which relief could be

granted and that the court lacked jurisdiction of the subject matter. The federal defendants moved to dismiss the action on the theory the plaintiffs lacked standing and because the complaint failed to state a cause of action.

The trial court entered summary judgment, concluding plaintiffs were not proper parties to bring this lawsuit. It further denied a motion to alter or set aside the summary judgment, which was supported by several affidavits setting out facts not previously before the court.[10]

 In their briefs before this Court the parties urge resolution of issues not reached by the trial court. The State defendants ask this Court to declare them immune from suit. All defendants, in one form or another, argue the complaint fails to state a claim upon which relief can be granted. Plaintiffs, on the other hand, urge the Court to grant partial summary judgment, a motion which—they submit—was before the trial court and implicitly denied by the granting of judgment for the defendants. After due consideration we have concluded that the only issue properly before us which is ripe for determination is the question of standing.[11]

The lower court's decision to grant Linclay's and Earth City Corporation's motion for summary judgment and to grant the other defendants' motions to dismiss was based solely on its resolution of the standing issue. We treat arguments concerning the substantive allegations only as they relate to the question of standing and do not reach the issues: whether the complaint as to any defendant states a claim upon which relief can be granted; whether the State defendants are immune from suit; or whether plaintiffs or any of the defendants are entitled to partial summary judgment or dismissal. These questions are best dealt with in the first instance by the trial court.

### The Facts Relating to Standing Issue

Plaintiffs' allegations of injury are contained in paragraph F of the amended complaint:

All of the individual plaintiffs, and many of the individual members of the corporate plaintiffs, and of the organizational members of plaintiff Coalition, will be adversely affected by the proposed construction and development hereinafter described. The area where defendants propose to build

---

10. The affidavits are intended to elaborate plaintiffs' allegations of injury. Twenty-one were filed in support of a motion by defendants to set aside the trial court's summary judgment. Eighteen are signed by members of plaintiff organizations who live in the vicinity of the development and testify to severe traffic congestion on I–70 near the Earth City site. Three of the affidavits are signed by engineers: one affiant has computed traffic counts in the Earth City area based on data compiled by the Missouri Highway Department and by project architects; a second has examined levee construction plans and determined the proposed structure to be inadequate to protect the Earth City area from flooding based on river levels over the past twenty years; a third has calculated daily emissions from projected traffic for the year 1980 with and without Earth City.

Appellees argue the affidavits should be disregarded by this Court because they were not before the trial court on the date it entered summary judgment. The affidavits

were, however, filed in support of the motion to reconsider the court's order and were alluded to in the court's order denying that motion. The affidavits are, therefore, part of the record on appeal.

11. An appellate court ordinarily will not review issues that have not been tendered to, and treated by, the trial court. *See* Peoples v. U. S. Dept. of Agriculture, 138 U.S.App. D.C. 291, 427 F.2d 561, 566 (1970). We do not, however, intend to suggest that either appellants or appellees will not be entitled to summary judgment or partial summary judgment or dismissal upon remand. As we view the trial court's order, it does not preclude the parties' renewing their motions for summary judgment, partial summary judgment, or dismissal upon any ground other than the particular standing issue decided herein. Because of its decision on the standing issue, the lower court simply did not reach or dispose of the other contentions tendered by the various parties.

Earth City is visible from I-70, from much of the City of St. Charles, and from parts of Bridgeton, as well as from the Missouri River. These individuals frequently see that area; they will be offended by its presence even when it is not under water; they will miss the view of open space and natural environment which will be replaced by the proposed development. Prior to the beginning of the construction described below, plaintiffs Charles and Anne Englert, and their family, and others would frequently drive or hike through that area, finding recreation, relaxation, quiet, peace, wildlife, open space, pleasing natural surroundings, and contentment; all these will be lost if the proposed development is completed. Many of them live in the immediate vicinity of the proposed development and others frequently drive past and see the area; they will thus be offended, injured, and inconvenienced by the traffic jams which will ensue, delaying their travel and causing increased traffic on secondary roads in Bridgeton and St. Charles to avoid the traffic jams; by the increased noise and air pollution which will accompany the proposed development and the increased traffic; by the loss of open space, which is in short supply in St. Louis County, and which is needed for its healthful, aesthetic, and psychological qualities. Even those individuals who do not frequently pass by the proposed development will be adversely affected by the loss of an opportunity for St. Louis County to build a regional park along the banks of the Missouri River, as planned previously, in that they will lose the opportunity to use such a park, and will have greater crowds forced upon other parks; and they will be further adversely affected by the increased crowding throughout St. Louis County.

Defendants have challenged factually plaintiffs' allegations concerning use of the Earth City tract. Discovery has shown that plaintiffs' on-tract uses are limited to driving through the tract on St. Charles Rock Road and Missouri Bottom Road, which roughly parallels the Missouri River on that portion of the tract within the City of Bridgeton and outside of the areas scheduled for immediate development. Among the named plaintiffs, only Mr. Englert testified with certainty that from time to time he walked over the tract. By affidavit defendants have established that Earth City Corporation is the fee owner of approximately 1,300 acres of the tract and it has never "given approval or consent to any of the individual plaintiffs, the corporate plaintiffs, or members thereof to make any use of said tract or any part thereof for any purpose whatsoever." With respect to this question appellants state:

By detailed interrogatories and cross-examination, defendants attempted to establish that none of the plaintiffs engaged in activities "on the 1600-acre tract" (I App. 44, 45, 46, 50, 114, 115, 116, 124, 148, 154, 174, 175, 239, 240, 241, 245, 246, 250, 251). Except for the facts that all of the plaintiffs, and members of plaintiff organizations, drive through or over the tract on St. Charles Rock Road, and past the tract on I-70, and look out over the tract either from their houses or in passing, and that the Englerts also drive and walk along Missouri Bottom Road, and have walked elsewhere in the tract in the past, and Allen Newsham used to fish over there (I App. 246), it did not appear that plaintiffs engage in activities "on" the tract.

Appellants' Brief, p. 16.

Before discussing the law of standing it is important to note in full the reasoning and analysis of the District Court with respect to this issue:

The Earth City project is to be constructed on a tract of land in St. Louis County, Missouri, in the vicinity of Interstate Highway 70 and the Missouri River. This tract consists of approximately 1,700 acres, 1,500 of

which are owned by Linclay Corporation and Earth City Corporation, and 200 of which are subject to an option to purchase held by Linclay Corporation. The entire project, including the levee and the interchange, is being financed with funds provided by the Linclay Corporation and the Earth City Corporation.

In their amended complaint, plaintiffs allege that the individual plaintiffs and the individual members of the corporate plaintiffs, and the organizational members of plaintiff coalition, who reside, work, or pass by the vicinity of the project will be adversely affected by the construction in that it will be offensive; will replace the open space; create traffic jams; increase noise and air pollution; and will cause the loss of an opportunity for St. Louis to build a regional park. One of the three individual plaintiffs, John Nichols, who lives approximately three miles from the proposed site, alleges that the development would depreciate the value of his home, but stated in his deposition that he had no evidence this was true. He further stated that he had never been on the proposed site for any reason, except to drive over it. The other two individual plaintiffs, Charles and Anne Englert, live approximately a mile and one-half from the project. They also claim that the property value of their home would depreciate, but were likewise unable to substantiate such a claim. Other than driving over the site, Mr. Englert stated that he walked on the site once or twice a month and his wife stated that she has been on this tract of land. Mr. Englert further stated that he knew the land was not publicly owned and indicated he knew he had no permission to use it.

Although plaintiffs have alleged that they will be adversely affected, none has shown any individualized harm. None was able to allege facts showing he has or will suffer an economic loss as a result of the Earth City project. The allegations in regard to the air and noise pollution, and the traffic congestion, are subjective, conclusory, and unsubstantiated. In this regard it might be noted that there are federal statutes and regulations, state statutes, and local ordinances which provide a standard for air and noise pollution. Plaintiffs have not alleged that there have been violations of such statutes, nor can they conceivably show that these will be violated in the future. Moreover, there is nothing in the record indicating that any of the plaintiffs will be affected in their activities by the actions of defendants, much less significantly affected.

The only injury to plaintiff is the apparent fact that the actions of defendants are personally displeasing or distasteful to them due to the parties' differing philosophies of land-use planning. The plaintiffs want open space, while the corporate defendants want a planned urban community. Judicial review does not extend under the APA to those who seek to do no more than vindicate their own value preferences through the judicial process. Sierra Club v. Morton, *supra*; *see also*: San Francisco Tomorrow v. Romney, 342 F.Supp. 77 (N.D.Cal.1972).

347 F.Supp. 634, 637–638.

### The Law Relating to Standing Issue

Standing doctrine was described in 1953 as "a complicated speciality of federal jurisdiction, the solution of whose problem is * * * more or less determined by the specific circumstances of individual situations * * *." United States v. Federal Power Commission, 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953) (Frankfurter, J.). Since 1953 the doctrine has evolved considerably. Whether that evolution be toward greater complexity or simplicity is disputed by commentators.[12]

12. Chief Judge Henry Friendly believes complexity has been removed, H. Friendly, Federal Jurisdiction: A General View, 115 (1973). Others find present doctrine lack-

■ The present test for standing is twofold: whether the challenged action has caused plaintiff injury in fact and whether that injury was to an interest arguably within the zone of interests to be protected or regulated by the statutes that the agencies were claimed to have violated. *See* United States v. SCRAP, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L. Ed.2d 254 (1973); Adolphus v. Zebelman, 486 F.2d 1323 (8th Cir. 1973). The allegations of injury contained in the amended complaint need to be examined at this stage of the proceeding, only with reference to the "injury in fact" test. The trial court determined plaintiffs had not suffered injury and granted the motion for summary judgment on that basis; it did not define the "zone of interests" of the statutes claimed to have been violated nor did it determine whether the interests of plaintiffs said to be injured were "arguably" within that zone.[13]

■ The requirement of injury in fact assures complainants "have the personal stake and interest that impart the concrete adverseness required by Article III." Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Inju-

ry in fact is therefore a constitutional limitation on federal jurisdiction and without such injury a case or controversy does not exist. *See* Adolphus v. Zebelman, *supra*.[14]

■ "Injury in fact" has long included economic harm.[15] The Supreme Court's opinion in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L. Ed.2d 636 (1972), is unequivocal that those. who claim only injury of a non-economic nature may also have standing to challenge governmental action.

*Sierra Club* concerned a challenge by an environmental group to a proposed development in the Mineral King Valley, which is adjacent to the Sequoia National Park in the Sierra Nevada Mountains of California and within the Sequoia National Forest. Plaintiff sued under the Administrative Procedure Act to enjoin the construction of a ski resort proposed by Walt Disney Enterprises, Inc., and approved by the National Forest Service. The Sierra Club specifically disclaimed to be representing individualized interests, 405 U.S. at 735 n. 8, 92 S.Ct. 1361, and failed to allege that the development would affect specifically the Club, or any of its members, in any of

ing. *See generally*, Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief, 83 Yale L.J. 425 (1974); Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv.L.Rev. 645 (1973).

13. In both *Sierra Club* and *SCRAP* the Supreme Court determined only the question of injury in fact with respect to plaintiffs' allegations; it expressly disclaimed consideration of the zones of interest of the statutes said to be violated. 405 U.S. at 733 n. 5, 92 S.Ct. 1361; 412 U.S. at 686 n. 13, 93 S.Ct. 2405. Although the question is not before the Court, both appellants and appellees have argued the application of the zone of interest test to the facts of this case. Appellees contend the relevant zone is to be defined from statutes allegedly requiring the Corps and DOT to take jurisdiction over aspects of the project. 33 U.S.C. §§ 401, 403, 407, 565 and 701; 16 U.S.C. § 662; 23 U.S. C. §§ 111, 116 and 123. Appellants, on the other hand, contend NEPA is the statute to which the Court must look in evaluating the relevancy of appellants' asserted interests. The Court further notes that, in paragraph 42 of the amended complaint, plaintiffs al-

lege the federal defendants have not "interpreted and administered the policies, regulations and public laws of the United States in accordance with the policies set forth in the National Environmental Policy Act, * * *." This allegation points up the basis of the controversy between the parties with respect to the proper definition of the zone of interests in this case. *See generally*, Comment, Standing to Sue in Federal Courts to Prevent Governmentally Sponsored Insults to the Environment: The Aftermath of Sierra Club v. Morton, 41 U.Cin.L.Rev. 669, 672 (1972).

14. The same standard is to be used to determine whether plaintiff is a "person aggrieved" under the Administrative Procedure Act, 5 U.S.C. § 702. *See* Barlow v. Collins, 397 U.S. 159, 164–165, 90 S.Ct. 832, 25 L. Ed.2d 192 (1970).

15. *See, e. g.*, Hardin v. Kentucky Utilities Co., 390 U.S. 1, 7. 88 S.Ct. 651, 19 L.Ed.2d 787 (1967); Chicago v. Atchison, T.&.S.F.R. Co., 357 U.S. 77, 83, 78 S.Ct. 1063, 2 L.Ed. 2d 1174 (1957); FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 477, 60 S.Ct. 693, 84 L.Ed. 869 (1939).

their activities. Plaintiff chose rather to appear as a representative of the public and contended its longstanding concern with and expertise in matters affecting the environment were sufficient to give it standing.

The Court agreed that "injury in fact" comprehended more than economic harm.

> Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.

405 U.S. at 734, 92 S.Ct. at 1366. But it went on to point out that standing under Article III required more than an injury to a "cognizable interest." "It requires that the party seeking review be himself among the injured." *Id.* at 735, 92 S.Ct. at 1366. The failure of the Club to particularize the alleged injury to it or its members was therefore fatal. The Court concluded, therefore, that plaintiff's allegations of injury were insufficient to give it standing to challenge the disputed governmental action.

In noting the Club's omissions from its complaint, however, the opinion is instructive as to the requisite allegations:

> The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less than they use it in any way that would be significantly affected by the proposed actions of the respondents.

405 U.S. at 735, 92 S.Ct. at 1366. One must agree with the commentators that the *Sierra* case, as between the parties, "amounted to no more than a ruling on a technical defect of pleading." [16] On remand the trial court permitted plain-

tiff to amend its complaint and the complaint withstood motions to dismiss, although standing was no longer in dispute. *See* Sierra Club v. Morton, 348 F.Supp. 219 (N.D.Cal.1972).

The Supreme Court's most recent pronouncements on standing are contained in the Court's decision in United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). That case considered the propriety of an injunction, entered by a three-judge district court, restraining the I.C.C. from permitting and railroads from collecting a rate increase on all goods being transported for purposes of recycling. Plaintiffs alleged the proposed surcharge, by increasing the cost of recycled goods, would increase pressure on natural resources used as components of new as opposed to "used" products. They contended the rate increase was a major federal action significantly affecting the quality of the human environment and, therefore, required compliance with NEPA. The complaint alleged members of plaintiff organization would suffer economic, recreational, and aesthetic harm stemming from the increased use of natural resources and that each member of SCRAP used the natural resources in the Washington area as well as in the locality of their legal residence. These uses included camping, hiking, fishing as well as others. The Court found these allegations to be adequate, noting they went beyond the allegations in the *Sierra Club* by asserting specific uses and benefits, experienced by defined individual members of the plaintiff organization, that arguably would be impaired by the challenged agency action. 412 U.S. at 685, 93 S.Ct. 2405.

■ Decision by the trial court in the instant case occurred between the decision in *Sierra Club* and that in *SCRAP*. Chief Judge Meredith naturally relied on *Sierra Club* and terms plaintiffs' injury to be no more than "personal dis-

---

16. Scott, Standing—A Functional Analysis, 86 Harv.L.Rev. 645, 667 (1973).

pleasure." As this Court views plaintiffs' allegations, they assert injury beyond mere displeasure. Individual plaintiffs and members of plaintiff organizations claim particularized injury stemming in various ways from the loss of open space and the changes occasioned, or threatened, by the project. For instance, they assert that they will lose off-tract uses such as viewing the open space and natural environment, which, contend plaintiffs, provides aesthetic and psychological benefit. In addition, the Earth City development, allege plaintiffs, will injure them by causing an increase in automobile traffic (and consequent traffic jams and delay in travel), general crowding and attendant increases in air and noise pollution. They contend also that the private development of the flood plain area will preempt public use of the land for a park. Such allegations constitute more than simple assertions of distaste or displeasure; they are statements of specific injury experienced by ascertainable individuals who reside near or pass through the affected area.

Defendants seek to distinguish the case from the *SCRAP* decision by emphasizing the trial court entered summary judgment rather than simply dismissing the complaint. *See* 412 U.S. at 689, 93 S.Ct. 2405. They assert they disproved plaintiffs' allegations of harm by demonstrating that only one individual plaintiff actually hiked on the tract and that his rights in use of the land were questionable;[17] and that plaintiffs' allegations of air and noise pollution were unsubstantiated by evidence, indeed, even allegation, that emissions stemming from the development would exceed federal and state standards. But, neither federal or state emission standards have relevancy to the issue of standing. Plaintiffs allege only that pollution will increase in the area because of the development and the increase will cause them harm. *See* Citizens for Clean Air, Inc. v. Corps of Engineers, 349 F.Supp. 696, 705 (S.D.N.Y.1972). A requirement that the alleged harm or injury stem only from some law violation would constitute a reversion to the "legal interest" test of standing discarded in Data Processing Service v. Camp, 397 U.S. 150, 153 and note 1, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

With respect to off-tract uses it should be noted that the Supreme Court in *Sierra Club* implicitly recognized that the development in Mineral King would invariably affect the adjoining Sequoia National Park. 405 U.S. at 735, 92 S. Ct. 1361. An access road to Mineral King would also pass through the Park to provide the resort with electricity. In his dissent Mr. Justice Blackmun graphically illustrated the interrelationship of the ski resort and the National Park. He focuses on the dramatic increase in automobile traffic within the Park caused by patrons of the ski resort and notes an objection to limiting standing to only those who are on-site users of the affected land. The real "user" of Mineral King is an unlikely adversary to the Disney project. "He naturally will be inclined to regard the situation as one that would benefit him economically." 405 U.S. at 759, 92 S.Ct. at 1378. Thus plaintiffs' off-tract interest in the land may very well be impaired and such injury is adequate to give standing to challenge the proposed project.[18]

17. In deposition John Englert, the only plaintiff with recent and specific experience hiking on the tract, testified he realized the land was not public. Defendant Earth City Corporation, via affidavit executed by an officer of the corporation, maintains it has never given permission to plaintiffs for any use whatsoever. We are not, however, predicating plaintiffs' standing upon any allegation of on-tract uses.

18. *See* Alameda Conservation Association v. California, 437 F.2d 1087, 1091 (9th Cir. 1971), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 649 (1971) ; San Francisco Tomorrow v. Romney, 472 F.2d 1021 (9th Cir. 1973), reversing 342 F.Supp. 77, 79 (N.D.Cal.1972) (standing allegations are most explicitly stated in district court opinion) ; Citizens for Clean Air, Inc. v. Corps of Engineers, 349 F.Supp. 696, 705 (S.D.N.

Indeed, despite the dicta concerning the possibility of summary judgment on a standing question contained in the Court's *SCRAP* opinion, 412 U.S. at 689, 93 S.Ct. 2405, this Court believes that such a disposition will be proper in only a very few and unique cases. Standing is a threshold inquiry; it requires focus on the party seeking to have his complaint heard in a federal court; and it eschews evaluation of the merits. The court is not to consider the weight or significance of the alleged injury, only whether it exists. "[A]n identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation."[19]

The judgment is reversed and the cases remanded for further proceedings consistent with this opinion.

Reversed and remanded.

Y.1972) (*inter alia*, plaintiffs reside in vicinity of proposed power plant and complain of increase in air pollution that in turn would threaten plaintiffs' health).

19. Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613 (19 ). Professor Davis' conclusion is quoted with approval in United States v. SCRAP, 412 U.S. at 689 n. 14, 93 S.Ct. 2405.